PLAYBOY ENTERPRISES, INC., Plaintiff,

v.

P. K. SORREN EXPORT COMPANY INC. OF FLORIDA, and Sorren, Inc., Defendants.

No. 81–1264–Civ–CA.

United States District Court, S. D. Florida.

April 15, 1982.

Supplemental Judgment May 10, 1982.

Robert Sondak, Paul, Landy, Beiley, Harper & Metsch, P. A., Miami, Fla., for plaintiff.

Dubbin, Schiff, Berkman & Dubbin, Miami, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ATKINS, Chief Judge.

THIS MATTER came before this Court for non-jury trial, and the Court having heard the evidence, arguments of counsel, and duly considered the matter, hereby finds:

### FINDINGS OF FACT

1. Plaintiff PLAYBOY ENTERPRISES, INC., (hereinafter "PEI"), a Delaware corporation, with its principal place of business at 919 North Michigan Avenue, Chicago, Illinois, is the owner of the trademark rights here in suit.

2. Defendant P. K. Sorren Export Company, Inc. of Florida (hereinafter "SORREN—FLA.") is a Florida corporation with a place of business at 22 N.W. First Street, Miami, Florida. Defendant SORREN, INC. (hereinafter "SORREN—N.Y.") is a New York corporation having a place of business at 250 West 54th Street, New York, New York and at 22 N.W. First Street, Miami, Florida. Defendants SORREN—N.Y. and SORREN—FLA. are under the common

ownership and control of Mr. Paul K. Sorren.

3. PEI is the owner of the following United States trademark registrations for the trademarks PLAYBOY and RABBIT HEAD Design, which have been duly registered in the United States Patent and Trademark Office:

(i) Registration No. 600,018 for PLAYBOY dated December 28, 1954, for a monthly magazine;

(ii) Registration No. 643,926, for RABBIT HEAD Design, dated April 9, 1954 for a monthly magazine;

(iii) Registration No. 728,889, for RABBIT HEAD Design, dated March 20, 1962 for ties and men's and women's shirts; and

(iv) Registration No. 984,548, for PLAYBOY/RABBIT HEAD Composite, dated May 21, 1974 for articles of men's and women's clothing—namely, shirts, sleepwear, ties, ascots, sweaters, warm up shirts, bath kilts, and hosiery.

Affidavits under Sections 8 and 15 of the Lanham Act (15 U.S.C. §§ 1058 & 1065) have been filed with and accepted by the United States Patent and Trademark Office.

The PLAYBOY and RABBIT HEAD Design marks are well-known in the United States and abroad.

4. PEI is not in the business of manufacturing or selling any product, either at wholesale or retail. Among other things, it licenses others to manufacture goods bearing Playboy trademark, for which Plaintiff receives a royalty of from five (5%) to seven (7%) percent of the licensee's net sales. Licensees of PEI are licensed to sell merchandise directly to retailers such as the Defendants herein. Examples of such licenses are the licenses issued to Gilbert Hoisery Company for the manufacture and sale of hoisery and to Ruby International, Inc. for the manufacture and sale of underwear. A Trifle Bit is licensed to sell active and casual sportswear and tops under the PLAYBOY ENTERPRISES, INC. trademark. All of these companies sell directly to retailers and also may sell to Playboy Sales, Inc. (hereinafter "PSI"), a separate corporation in the Playboy group of corporations. A retailer such as Defendants can acquire the same goods directly from the manufacturer of the goods and also from Playboy Sales, Inc.

5. PSI, a wholly-owned subsidiary of PEI, is in the business of selling PLAYBOY trademark goods to retailers such as Defendants, either directly or through field representatives, selling goods through Playboy gift shops and selling goods by direct mail. Playboy Sales, Inc. does not manufacture any of the goods it sells. It acquires those goods either from vendors under contract to it, or from licensees of PLAYBOY ENTERPRISES, INC. During all times relevant to this suit, knit shirts, bearing the "RABBIT HEAD Design", were distributed solely by PSI and not by any licensees of PEI.

6. PEI has promoted its PLAYBOY and RABBIT HEAD Design trademarks so as to make them strong marks with distinctiveness in the market place for which various manufacturers and retailers have paid and are paying substantial sums to PEI in order to sell PEI licensed and authorized products and goods.

7. PEI's PLAYBOY and RABBIT HEAD Design trademarks have come to be identified by the general public with goods and products emanating from, sponsored by, authorized by or affiliated with PEI.

8. Both Defendants are engaged in the business of selling consumer merchandise, primarily to tourists and for export.

Since the mid-seventies, defendant SORREN—N.Y. has been a major customer of Playboy Sales, Inc. for genuine PEI clothing products, including shirts, bearing the PLAYBOY and RABBIT HEAD Design marks and has sold such clothing products to the public from its store locations in New

York and Florida. All such purchases were made from PSI; neither Defendant has ever done business directly with PEI.

9. From at least as early as 1977 and continuing on through 1979, defendant SORREN—N.Y. purchased shirts bearing a rabbit head emblem[1] from Grenadier Knitwear, Ltd., Statesville, North Carolina (hereinafter "Grenadier") and sold said shirts from store locations in New York and Florida.

10. In 1980 and 1981, defendant SORREN—N.Y. continued to purchase shirts bearing a rabbit head emblem from Rolex Industries, Inc., Charlotte, North Carolina (hereinafter "Rolex") which company had taken over the SORREN—N.Y. account from Grenadier. These shirts were sold by SORREN—N.Y. and SORREN—FLA. At least some sales of such shirts by defendants were made under a placard which prominently displayed the PLAYBOY mark.

11. The purchase by defendants from Rolex and Grenadier of shirts bearing the rabbit head emblem and the sale by defendants of such shirts was neither authorized nor approved by PEI.

12. Defendants' dealing in counterfeit and genuine wearing apparel bearing or sold under the PLAYBOY and RABBIT HEAD Design marks has confused and deceived and is likely to confuse and deceive the public as to the source, origin or sponsorship of the goods.

13. Defendants' dealing in counterfeit and genuine wearing apparel bearing or sold under the PLAYBOY and RABBIT HEAD Design marks has misled and is likely to mislead the public to believe that the shirts originate from or are associated with PEI.

14. Defendants' dealing in counterfeit and genuine wearing apparel bearing or sold under the PLAYBOY and RABBIT HEAD Design marks has diluted and is likely to dilute the distinctiveness and reputation of the PEI marks here in suit.

15. Defendants' dealing in counterfeit and genuine wearing apparel bearing or sold under the PLAYBOY and RABBIT HEAD Design marks has damaged PEI by unjust profits to defendants, and damage to PEI's reputation and goodwill.

16. Defendants' dealing in counterfeit and genuine wearing apparel bearing or sold under the PLAYBOY and the RABBIT HEAD Design marks has resulted in unjust profit to defendants.

17. Defendants' involvement in the manufacture of shirts bearing a rabbit head emblem first with Grenadier and later with Rolex constituted a deliberate attempt to counterfeit plaintiff's goods.

18. Defendants' aforesaid dealings with counterfeit and genuine shirts bearing or sold under the PLAYBOY and RABBIT HEAD Design marks were carried out with a willful, deliberate intention of trading on the goodwill of PEI's PLAYBOY and RABBIT HEAD Design marks.

19. Defendants have not been cooperative in producing discovery,[2] and their records of purchases from Grenadier, tardily produced, are incomplete. Defendants have also failed to produce adequate evidence of their costs related to the infringing goods, other than the purchase price and certain freight charges.

20. The Rolex compiled invoice list which is annexed hereto as Exhibit A shows the sales of shirts bearing a rabbit head emblem by Rolex to SORREN—N.Y. and SORREN—FLA. during 1980 and 1981.

21. The Grenadier purchase orders listed below show the purchase of rabbit head design emblems by Grenadier from Artistic

---

1. When the term "RABBIT HEAD Design" appears herein, it refers to PEI's trademark. When the term "rabbit head emblem" is used, it refers to the emblem or emblems appearing on shirts made by Rolex and/or Grenadier. The latter is a counterfeit of the former as that term is defined in the Lanham Act (15 U.S.C. § 1127).

2. See Order on Pending Motions 2–3, filed April 2, 1982.

Identifications Systems, Inc. (hereinafter "AIS"), Pompton Lake, New Jersey, for use in making shirts sold to SORREN—N.Y., and SORREN—FLA.

| Purchase Order | Date | Price | Quantity |
|---|---|---|---|
| 2281 | n/a | n/a | 700 dozen (on third party evidence) |
| 3745 | 9/26/77 | $.80/dozen | 875 dozen (10,500) |
| 2025 | 7/27/78 | $.85/dozen | 13,000 |

Defendants purchased from Grenadier shirts bearing the above emblems.

22. The emblems purchased by Grenadier from AIS were used by Grenadier to make shirts and such shirts were sold to defendants at a price of $43.50/dozen.

Sometime during 1979–1980, the ownership of Grenadier changed. At about this time, Messrs. Rosenberg and Leventhal left the employ of Grenadier and established Rolex International, Inc. Rosenberg had been a major shareholder in Grenadier and both Rosenberg and Leventhal are major stockholders in Rolex. At about the time of these events, the defendants terminated their business relationship with Grenadier and began dealing with Rolex.

Defendants subsequently bought rabbit head emblem shirts from Rolex at prices varying from $46/dozen to $63/dozen.

23. Defendants sold shirts bearing the rabbit head emblem purchased from Rolex and Grenadier according to the following price schedule:

| | Cost to Defendants (per dozen) | Export Price (doz.) | Wholesale Price (doz.) | Retail Price (doz.) |
|---|---|---|---|---|
| Grenadier | $43.50 | $58.00 | $81.00 | $93.00 |
| Rolex | 46.00 | 58.00 | 81.00 | 93.00 |
| Rolex | 51.00 | 63.00 | 81.00 | 93.00 |
| Rolex | 54.00 | 66.00 | 81.00 | 93.00 |
| Rolex | 63.00 | 75.00 | 117.00 | 129.00 |

Defendants exported approximately thirty (30%) percent of the shirts, with the remainder being equally divided between retail and wholesale sales.[3]

24. On June 11, 1981, the United States Marshal seized 2,202 Rolex rabbit head emblem shirts from defendants' store in Miami, Florida. An additional 14,821 shirts remained in defendants' inventory.

25. Defendants' gross costs, sales and profits are:

3. Defendants claim that as many as fifty-seven (57%) percent of the shirts were exported, but are unable to substantiate the claim. Plaintiff is willing to concede that at least thirty percent probably were exported. Accordingly, the Court adopts the plaintiff's estimate.

| | Shirts Bought from Grenadier | Shirts Bought from Rolex |
|---|---|---|
| Number of shirts | 32,060 [4] | 48,357 [5] |
| Total Purchase Price | $116,217.50 | $140,321.74 [6] |
| Total Sales Price | 209,159.44 | 219,207.22 [6] |
| Gross Profits | 92,941.94 | 78,885.48 |

Defendants' total gross profits from the sale of rabbit head emblem shirts was $171,827.42. The only cost to the defendants, other than purchase price, which was proven to relate to the sale of the infringing shirts, was freight charges. These were estimated at $4,500.00. Thus, defendants' total net profit from the sale of rabbit head emblem shirts was $167,327.42.

26. Defendants' combined total sales exceeded $30,000,000 for the year ending June 30, 1980, and exceeded $25,000,000 for the year ending June 30, 1979. *See* DX # 6.

27. Plaintiff has been unable to demonstrate that either it, PSI, or plaintiff's licensees would have sold the shirts which defendants sold, or that, had defendants not been buying counterfeit goods, they would have bought authentic Playboy goods. Authentic Rabbit Head Design shirts were more expensive than the counterfeit shirts and were, in the opinion of Paul K. Sorren, of inferior quality. It is as likely as not that defendants, had they not obtained counterfeit Playboy shirts, would simply have sold golf shirts with other emblems, and that defendants' customers would as readily have bought such other shirts.

## CONCLUSIONS OF LAW

This action was brought by plaintiff, PEI, under the Lanham Act, 15 U.S.C. § 1051 *et seq.,* and for related unfair competition, jurisdiction being proper pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1332. Venue is proper based on 28 U.S.C. §§ 1391(b) and (c). PEI is the true and rightful owner of numerous valid United States trademark regulations for the trademark PLAYBOY and the PEI RABBIT HEAD Design including Registration Nos. 600,018, 728,889, and 984,548, which are incontestable. 15 U.S.C. §§ 1058 and 1065.

PEI claims that defendants Sorren—N. Y. and Sorren—Fla. have infringed PEI's federal PLAYBOY and RABBIT HEAD Design trademark registrations in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114(1), and that defendants' use of the Rabbit Head emblems constitutes the application of a false designation of origin, or false description or false representation of goods sold in interstate commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and an infringement of PEI's common law PLAYBOY and RABBIT HEAD Design trademarks. PEI seeks injunctive relief, pursuant to 15 U.S.C. § 1116, the delivering up to it for destruction of all infringing labels, pursuant to 15 U.S.C. § 1118, and monetary relief, including the defendants' profits, damages sustained by the plaintiff, and the costs of this action, pursuant to 15 U.S.C. § 1117.

4. PEI claims that the defendants purchased 55,331 shirts from Grenadier. PEI bases this figure on the number of rabbit head emblems shipped by AIS to Grenadier. Defendants' records, admittedly incomplete, only show the receipt of 32,060 shirts from Grenadier. It is probable that defendants purchased more shirts than shown in their records. Nevertheless, I find that PEI has actually proven the purchase by defendants of only 32,060 shirts from Grenadier.

5. I do not adopt PEI's claim that defendants purchased an additional 2,145 Rolex shirts at $46/dozen after the seizure of shirts by the United States Marshal.

6. I have deducted from these figures the purchase and sale prices, respectively, of shirts now in the custody of the United States Marshal or in the defendants' inventory.

## I. Likelihood of Confusion

 Infringement of a duly registered trademark is governed by the provisions of 15 U.S.C. § 1114(1), which imposes liability upon "use . . . likely to cause confusion, or to cause mistake, or to deceive." The same test is applicable to the common law unfair competition claim. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir. 1980), *reh. denied,* 5 Cir., 617 F.2d 295, *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129, (hereinafter *"Amstar"*). Likewise, defendants' use of the rabbit head emblem can represent a false designation of origin or false description proscribed by 15 U.S.C. § 1125, only if defendants' use of this emblem is likely to be confused with PEI's RABBIT HEAD Design. *Amstar, supra,* 615 F.2d at 258, *citing Boston Professional Hockey Ass'n., Inc. v. Dallas Cap and Emblem Mfg., Inc.,* 510 F.2d 1004, 1013 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975) (hereinafter *"Boston Professional Hockey"*). Plaintiff's claims against defendants, therefore, turn on the determination of whether defendants' use of the rabbit head emblem is likely to cause confusion, mistake, or deception. In the Fifth Circuit, the likelihood of confusion is determined by evaluating a variety of factors, including the type of trademark at issue; similarity of design; similarity of product; identity of retail outlets and purchasers; identity of advertising media utilized; defendants' intent; and actual confusion. *Amstar, supra,* 615 F.2d at 259.

 An evaluation of these factors leads the Court to conclude that defendants' use of the rabbit head emblem was intended and is likely to cause confusion, mistake, and deception.

### A. Type of Trademark

 The strength and distinctiveness of PEI's marks are a key consideration in determining the scope of protection they should be accorded. While PLAYBOY may be at best a "suggestive" mark, that is, one which implicitly refers to its product's qualities, the RABBIT HEAD Design is a purely capricious and arbitrary mark, one whose literal meaning is unrelated to the product but whose secondary meaning is strong. Both marks are well-known and widely associated with PEI's products. In addition, the defendants, unlike those in *Amstar, supra,* and *Sun Banks of Fla. v. Sun Fed. Savings and Loan,* 651 F.2d 311 (5th Cir. 1981), have not introduced any evidence of third-party uses of these marks, other than by parties involved in related litigation.[7] I must therefore conclude that these marks are strong marks, entitled to broad protection.

### B. Similarity of Design

 Defendants' president and sole shareholder, Paul K. Sorren, testified that he felt that the two marks (the rabbit head emblem and the RABBIT HEAD Design) were dissimilar, but Sorren's own testimony revealed his confusion about the marks and his inability to readily identify the salient differences in the marks.[8] Several other witnesses testified that the marks were similar, or at least more similar than dissim-

---

**7.** There is currently a pending lawsuit by PEI against Rolex in United States District Court for the Western District of North Carolina, Case No. C–C–81–237. PEI had not, as of the time of trial, taken any action against AIS, the manufacturer of the rabbit head emblems.

**8.** Trial Transcript 434–436.
Sorren also offered the theory that Grenadier provided Rolex with two different rabbit head emblems. Defendants were unable, however, to produce any examples of shirts bearing the first mark, which was allegedly more distinct

from PEI's mark. Sorren himself characterized one such mark as extremely similar to PEI's mark, then, when confronted with the fact that the shirt bearing that mark (PX # 58) was from the period when the differing marks were supposedly used, attempted to discern some minute distinctions. *Id.,* at 434–436, 445–447. None of the other witnesses corroborated Sorren's version. I find neither Paul Sorren's testimony on this question nor the defendants' "two mark" theory to be credible.

ilar.[9] Plaintiff need only show that the false mark was likely to confuse a consumer at first impression, not that it was undistinguishable from the true mark. *Chevron Chemical Co. v. Voluntary Purchasing Group,* 659 F.2d 695 (5th Cir. 1981).

I conclude that defendants' rabbit head emblem and PEI's RABBIT HEAD Design were, though possibly distinguishable upon close inspection, very similar.

### C. Similarity of Product

There is no dispute that defendants sold golf-type shirts bearing the rabbit head emblem which were of the same general type and design as the golf type shirts sold by PSI bearing the RABBIT HEAD Design. In addition, PSI distributed a variety of sportswear goods bearing their marks, including sweatshirts, sweaters, and socks.

### D. Identity of Retail Outlets and Purchasers

■ Sorren vigorously argues that PSI was not in direct competition with the defendants because they were geared to different markets. The fact that plaintiffs and defendants were not in direct competition is irrelevant in determining whether an infringement occurred. *See Maltina Corp. v. Cawy Bottling Co., Inc.,* 613 F.2d 582 (5th Cir. 1980). Defendants' sales were primarily geared to tourists, and, to a lesser extent, to wholesale exports. Defendants did, however, sell a variety of sportswear including authentic Playboy goods. The existence of a supplier-distributor relationship between plaintiff's subsidiary, PSI, and the defendants, in goods which were similar to the shirts in question and which bore the authentic PLAYBOY and RABBIT HEAD

Design marks, is highly probative of likelihood of confusion. *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.,* 656 F.2d 186, 191 (5th Cir. 1981). I find that Sorren's outlets were precisely the type of retail outlet where consumers would expect to find authentic Playboy products, including golf shirts bearing the RABBIT HEAD Design. Paul Sorren himself further testified that his customers were interested in an attractive, Munsingwear-type shirt, with an emblem. Thus, I also conclude that the defendants' customers were potential purchasers of authentic Playboy shirts.

### E. and F. Advertising/Actual Confusion

■ There was no evidence in this case about the advertising media used by plaintiff or defendants in marketing the goods in question.[10] Neither was there evidence of actual confusion. While actual confusion is a strong index of the likelihood of confusion, it is not essential that any actual confusion be shown.[11] *Chevron Chemical Co. v. Voluntary Purchasing Groups,* 659 F.2d 695, 705 (5th Cir. 1981); *Amstar, supra,* 615 F.2d at 263; *Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons,* 523 F.2d 1331 (2d Cir. 1975); *James Burrough, Ltd. v. Sign of Beefeater, Inc.,* 572 F.2d 574, 578 n. 3 (7th Cir. 1978); *Faberge, Inc. v. Saxony Products, Inc.,* 605 F.2d 426 (9th Cir. 1979). Defendants' reliance on *Perfect Fit Industries v. Acme Quilting Co.,* 618 F.2d 950 (2d Cir. 1980), for the opposite view is misplaced, as that case was a trade dress case not involving a registered trademark and, in any event, would not be controlling in light of contrary case law in this circuit.

### G. Intent

Perhaps the most important factor is the defendants' intent in using the rabbit head

---

**9.** *See, e.g.,* Deposition of Fred Schwartz 8–11 (Aug. 26, 1981).

**10.** There was evidence that Sorren—N. Y. advertised in Latin America, and that PEI advertised worldwide. There were no indications of whether this advertising involved the goods in question.

**11.** The closest indicator of actual confusion might be Paul Sorren's testimony, in his deposition, that he thought Grenadier and Rolex were authorized PEI licensees. Sorren later changed his position, however, and it is unlikely that he actually confused the Rolex or Grenadier shirts with authentic Playboy shirts.

emblems. Intentional copying of another's trademark is *prima facie* evidence both that the mark has a secondary meaning, and that the imitation is likely to confuse consumers. *See Perfect Fit Industries v. Acme Quilting Co., supra,* 618 F.2d 950. Fred Schwartz, former salesman for Grenadier Knitwear testified that Paul Sorren showed him a shirt, similar to the shirts in question, with a "bunny" emblem similar to the RABBIT HEAD Design, and asked Schwartz if he could copy it for Sorren.[12] Schwartz reported back to Martin Leventhal, then Vice-President of Sales for Grenadier. Schwartz next contacted label manufacturers to find one who could supply an appropriate rabbit emblem.[13] Schwartz then took three rabbit emblems to Sorren, along with an estimated price and assortment of colors. Sorren approved the emblem, colors, and price, and placed an order for over 700 dozen such shirts.[14] This all took place early in 1977. In subsequent correspondence with various Sorren employees, Leventhal referred to the shirts as the "Playboy" model (PX–43). Finally, the shirts were displayed at Sorren—Fla. with signs in English and Spanish, describing them as "Playboy" shirts. Despite Paul Sorren's denial of any knowledge of these signs, or that the rabbit head emblems on the Grenadier (and later, Rolex) shirts resembled the RABBIT HEAD emblem, I conclude that there is no doubt that Sorren intentionally set out to copy PEI's RABBIT HEAD design, and to pass off the Grenadier and Rolex-manufactured shirts as those of PSI by virtue of the substantial similarity between the two and the confusion that this was likely to generate on the part of potential consumers.

The obvious similarity of design, product, retail outlets and purchasers, along with the fact the defendants intentionally copied PEI's marks, requires a conclusion that defendants' use of the rabbit head emblem

was "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1).

## II. Abandonment

■ Defendants claim that PEI has abandoned its mark and is, therefore, estopped from seeking now to enforce it against the defendants. *See, e.g., James Burrough, Ltd. v. Sign of Beefeater, Inc., supra,* 572 F.2d at 578; *Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons, supra,* 523 F.2d at 1342. Defendants base this argument primarily on PEI's failure to institute legal action against AIS, the alleged manufacturer of the rabbit head emblems used on the Grenadier and Rolex shirts. This alone is insufficient to establish abandonment of PEI's trademark. PEI has not ceased using its marks. The courts have often held that the owner of a mark was estopped from enforcing the mark, or at least from seeking damages, when it took no action for an unreasonable period of time after learning of an infringing use. *James Burrough, Ltd. v. Sign of Beefeater, Inc., supra,* 572 F.2d at 578; *Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons, supra,* 523 F.2d at 1342. In each of these cases the owner took no action for several years after learning of the infringement. In this case PEI has known about AIS's actions for no more than one year. PEI has vigorously prosecuted the principals in this infringement scheme, Sorren (Sorren—Fla. and Sorren—N.Y.) and Rolex. PEI has also prosecuted numerous other infringers in recent years. *See Penthouse International, Ltd. v. Playboy Enterprises, Inc.,* 663 F.2d 371 (2d Cir. 1981); *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 486 F.Supp. 414 (S.D.N.Y.1980) (granting preliminary injunction), 511 F.Supp. 486 (S.D. N.Y.1981) (decision on merits); *Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.,* Case No. 81–0603–R (C.D.Cal.); *Playboy*

---

**12.** Deposition of Fred Schwartz 8–11 (Aug. 26, 1981).

**13.** *Id.* at 12.

**14.** *Id.* at 13.

*Enterprises, Inc. v. Shalom Ashkenazi,* Case No. 81–1791 (C.D.Cal.). Thus, defendants' claim that PEI has abandoned its mark or should be estopped from enforcing it is unfounded.

## III. Damages and Injunctive Relief

### A. Injunctive Relief

1. Defendants' sales of Grenadier and Rolex shirts bearing a rabbit head emblem and sold under a placard which included the word PLAYBOY have infringed PEI's federal PLAYBOY and RABBIT HEAD Design trademark registrations in violation of the Lanham Act, 15 U.S.C. § 1114(1).

2. Defendants' use of the rabbit head emblem constitutes the application of a false designation of origin, or false description or false representation of goods sold in interstate commerce in violation of the Lanham Act, 15 U.S.C. § 1125(a).

3. PEI's common law PLAYBOY and RABBIT HEAD Design trademarks have been infringed by defendants in violation of the common law of unfair competition.

4. PEI is entitled to an injunction enjoining defendants, and their officers, agents, servants, employees, attorneys and those persons in active concert and participation with them from the unauthorized use or employment in connection with buying, advertising, promoting, displaying, offering for sale or distributing of goods or merchandise containing or having attached or having in association therewith plaintiff's PLAYBOY or RABBIT HEAD Design trademarks and trade name or colorable imitations thereof and specifically including the shirts bearing a rabbit head design manufactured for defendants by Grenadier or Rolex or any related companies. 15 U.S.C. § 1116.

5. PEI is entitled to the delivering-up to it for destruction of all infringing labels. The Marshal and defendants are to deliver up to PEI all shirts in their possession or control bearing any infringing rabbit head design label and all infringing rabbit head design labels in their possession or control. 15 U.S.C. § 1118.

### B. Damages

The Lanham Act provides for recovery by a successful plaintiff of "(1) defendants profits, (2) any damages sustained by the plaintiff, and (3) the costs of this action." 15 U.S.C. § 1117. This recovery is cumulative, that is, the Court may award PEI both its damages and defendants' profits. *Maltina Corp. v. Cawy Bottling Co., Inc., supra,* 613 F.2d 582; *CPC Intern. v. Albury Sales Co., Inc.,* 504 F.Supp. 549 (S.D. Fla.1980). There are, however, different standards for the awarding of each.

#### 1. Defendants' Profits

Accounting for profits is an equitable remedy. It is often justified under an unjust enrichment theory where the defendants' infringement, as here, was deliberate and willful. *Maltina Corp. v. Cawy Bottling Co., Inc., supra,* 613 F.2d 582. Courts have also said that the accounting serves to deter future infringement, and is thus appropriate even where the plaintiff and defendant are not in direct competition. *Maltina Corp. v. Cawy Bottling Co., Inc., supra,* 613 F.2d at 585; *James Burrough, Ltd. v. Sign of Beefeater, Inc., supra,* 572 F.2d at 577. The plaintiff need not demonstrate any actual damages in order to obtain an accounting for profits. *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.,* 567 F.2d 154, 161 n. 15 (1st Cir. 1977).

PEI need only show defendants' gross sales of infringing goods. The burden of proof then shifts to defendants to demonstrate their costs. *Maltina Corp. v. Cawy Bottling Co., Inc., supra,* 613 F.2d at 586; *Deering Milliken & Co. v. Gilbert,* 269 F.2d 191 (2d Cir. 1959); *Obear-Nester Glass Co. v. United Drug Co.,* 149 F.2d 671, 673 (8th Cir. 1945), *cert. denied,* 326 U.S. 761, 66 S.Ct. 141, 90 L.Ed. 458, *reh. denied,* 326 U.S. 810, 66 S.Ct. 230, 90 L.Ed. 495.

[14] PEI has demonstrated gross sales of infringing goods by defendants of $428,-366.66. Defendants have adequately demonstrated the purchase price of and freight charges for these goods. Defendants seek to deduct various commissions and discounts in the sale of these goods, but have not been able to document these deductions. Defendants, conceding that it would be impossible for them to prove the specific costs associated with the infringing goods, seek to deduct a proportionate share of their overhead expenses. This they may do only if they can show that sales of the infringing goods actually increased their total expenses. *Maltina Corp. v. Cawy Bottling Co., Inc., supra,* 613 F.2d at 586. The Fifth Circuit has refused to allow such a deduction where, as here, the infringing sales constituted only a minute fraction of the defendants' total sales.[15] *Maltina Corp. v. Cawy Bottling Co., supra,* 613 F.2d at 586. Thus, defendants may not deduct a proportionate share of their overhead expenses. PEI may not, however, recover for profits which defendants would have made had they sold the rabbit head emblem shirts seized by the United States Marshal or the rabbit head emblem shirts remaining in defendants' inventory as of the date of trial.

### 2. Plaintiff's Damages

■ In order to recover damages (apart from defendants' profits), the plaintiff must show that it suffered actual damages. *Maltina v. Cawy Bottling Co., supra,* 613 F.2d at 587. The mark owner's royalties are normally used as the measure of damages, *Holiday Inns v. Airport Holiday Corp.,* 493 F.Supp. 1025, 1028 (N.D.Tex. 1980), but the plaintiff must prove both lost sales and that the loss was caused by defendants' actions. *Obear-Nester Glass Co. v. United Drug Co., supra,* 149 F.2d at 674; *Scovill Manufacturing v. U. S. Electrical Manufacturing Corp.,* 47 F.Supp. 619 (S.D.

N.Y.1942). Loss of reputation alone is insufficient to justify a separate award of damages. *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc., supra,* 567 F.2d at 162.

■ PEI has not demonstrated that it would have made any of the sales which defendants made, or that defendants would themselves have purchased authentic rabbit head design shirts had they not acquired counterfeit shirts. Thus, PEI is not entitled to an award of damages separate from an accounting for defendants' profits.

### 3. Trebling of Damages

■ The Court may award plaintiff up to three times the amount of profits made by the defendant, as justice shall require. 15 U.S.C. § 1117; *Deering Milliken & Co. v. Gilbert, supra,* 269 F.2d 191. Such an award is discretionary and may be based on a finding of wilfulness. *Boston Professional Hockey,* 597 F.2d 71. It may not be punitive, however, and must be based on an actual showing of harm. *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602 (3d Cir. 1978). *Caesar's World, Inc. v. Venus Lounge, Inc.,* 520 F.2d 269, 273 (3d Cir. 1975).

■ PEI has demonstrated that the defendants deliberately infringed its trademark. Inevitably, there must have been some harm to PEI's goodwill and reputation, but this has not been sufficiently demonstrated or quantified to justify an award on that basis. In addition, defendants' records of their infringing sales are incomplete, and one could infer from the records of AIS and Rolex that the defendants actually sold more infringing shirts than can be shown from defendants' records. While an award of excess damages is not a remedy for mere discovery violations, it is appropriate where, as here, the record strongly indicates that plaintiff's damages and defendants' profits were both greater than the amounts which were conclusively proven.

---

**15.** In *Maltina* the infringing sales constituted about six (6) percent of the defendants' total sales. The infringing sales here, which took place over four years, constituted less than two (2) percent of defendants' combined sales for the year ended June 30, 1980 alone.

*Boston Professional Hockey, supra,* 597 F.2d at 77. I find that plaintiff is entitled to twice the amount of profits shown to have been made by defendants in the sale of counterfeit goods. PEI is entitled to monetary relief of $334,654.84.

#### 4. Costs

I also find that PEI is entitled to recover its costs. 15 U.S.C. § 1117, Rule 54(d), F.R. Civ.P. PEI is directed to submit a bill of costs other than those covered by this Court's *Order on Pending Motions,* filed April 2, 1982.

#### 5. Attorneys Fees

In an exceptional case, this Court may award attorneys' fees. 15 U.S.C. § 1117; *Boston Professional Hockey, supra,* 597 F.2d 71. This is an exceptional case as defendants have deliberately arranged to obtain counterfeit goods and to pass off such goods as genuine PEI goods. Attorneys' fees are awarded to plaintiff. PEI is directed to submit within 10 days an affidavit reciting the work done, the time involved and the amount claimed for each such item of work, other than those covered by this Court's *Order on Pending Motions,* filed April 12, 1982. Defendant may file an affidavit in opposition within 10 days after receipt of such proof by plaintiff.

#### SUPPLEMENTAL JUDGMENT

This cause is before the Court *sua sponte* to clarify paragraph four of page fourteen of this Court's *Findings of Fact and Conclusions of Law,* filed April 15, 1982. It is hereby

ORDERED AND ADJUDGED that defendants, P. K. SORREN EXPORT COMPANY, INC., OF FLORIDA and SORREN, INC., and their officers, agents, servants, employees, attorneys, and those persons in active concert and participation with them are enjoined from the unauthorized use or employment in connection with buying, advertising, promoting, displaying, offering for sale, or distributing of goods or merchandise containing or having attached or having in association therewith plaintiff's PLAYBOY or RABBIT HEAD Design trademarks (as defined in the above-mentioned order) and trade name or colorable imitations thereof and specifically including the shirts bearing a rabbit head design manufactured for defendants by Grenadier or Rolex or any related companies.

WORKSHEET

*"Exhibit A"*

PLAINTIFF'S EXHIBIT

1000

| INVOICE # | DATE | DOZENS | STYLE NO. | | | | | PRICE DOZ. | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| 10207 | 1/11/80 | 663-2/12 | 382436 | | | | | 46.00 | 30,565.58 |
| 10177 | 1/11/80 | 286-4/12 | 382436 | | | | | 46.00 | 13,171.33 |
| 10434 | 5/1/80 | 96-11/12 | 382436 | | | | | 54.00 | 5,233.50 |
| 10435 | 5/1/80 | 96-7/12 | 382436 | | | | | 54.00 | 5,215.50 |
| 10440 | 5/6/80 | 55-6/12 | 382436 | | | | | 54.00 | 2,995.00 |
| 10441 | 5/5/80 | 55-10/12 | 382436 | | | | | 54.00 | 3,015.00 |
| 10449 | 5/13/80 | 131-6/12 | 382436 | | | | | 54.00 | 5,721.00 |
| 10450 | 5/13/80 | 131-4/12 | 382436 | | | | | 54.00 | 7,092.00 |
| 10452 | 5/15/80 | 65 | 382436 | | | | | 54.00 | 3,510.00 |
| 10453 | 5/16/80 | 65 | 382436 | | | | | 54.00 | 3,510.00 |
| 10462 | 5/21/80 | 138-11/12 | 382436 | | | | | 54.00 | 7,501.50 |
| 10463 | 5/21/80 | 139-1/12 | 382436 | | | | | 54.00 | 7,510.50 |
| 10466 | 5/29/80 | 146-2/12 | 382436 | | | | | 54.00 | 7,813.02 |
| 10467 | 5/28/80 | 146-4/12 | 382436 | | | | | 54.00 | 7,902.00 |
| 10483 | 6/1/80 | 9/12 | 382436 | | | | | 54.00 | 40.50 |
| 10677 | 11/5/80 | 556-8/12 | 10751,10752,10753,10754 | | | | | 51.00 | 20,230.17 |
| 10790 | 1/20/81 | 190-3/12 | 382436 | | | | | 63.00 | 11,985.75 |
| 10789 | 1/20/81 | 190-5/12 | 382436 | | | | | 65.00 | 11,986.25 |
| 11171 | 1/23/81 | 131-4/12 | 382436 | | | | | 63.00 | 8,274.00 |
| 11170 | 1/23/81 | 131. | 382436 | | | | | 63.00 | 8,253.00 |
| 11238 | 2/26/81 | 83-4/12 | 1001-Stripes | | | | | 63.00 | 5,240.50 |

WORKSHEET

| INVOICE # | DATE | DOZENS | STYLE NO. | PRICE/DOZ. | TOTAL |
|---|---|---|---|---|---|
| 11222 | 2/18/81 | 83-7/12 | 1001-Stripes | 65.00 | 5,265.7 |
| 10807 | 3/4/81 | 179-9/12 | 1001. | 63.00 | 11,306.9 |
| 10808 | 3/4/81 | 179-7/12 | 1001 | 63.00 | 11,315.7 |
| 10805 | 3/5/81 | 212-1/12 | 1001 | 63.00 | 13,361 |
| 10806 | 3/5/81 | 212-3/12 | 1001 | 63.00 | 13,364 |